IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO

IN RE:                                    Case No.  17-15526-CDP
Robert Joseph Bowers                      Chapter 7

Debtor(s).

## MOTION FOR ABANDONMENT OF REAL PROPERTY

COMES NOW, TOWD Point Mortgage Trust 2019-2, U.S. Bank National Association, as Indenture Trustee ("Movant"), by and through its attorney, Heather L. Deere, and hereby moves this Court pursuant to 11 U.S.C. §554 (b) and Fed. R. Bankr. P. 6007(b) for an Order abandoning certain real property by the Chapter 7 Trustee, and as grounds therefore, states as follows:

1.       This Court has jurisdiction pursuant to 11 U.S.C. § 554(b) and Fed. R. Bank. P. 6007, as this Motion is related to a pending proceeding in the United States Bankruptcy Court, District of Colorado, Chapter 7 Case No. 17-15526-CDP.

2.       As set forth in the affidavit attached to this Motion and incorporated herein by reference pursuant to L.B.R. 4002-3(c), the Debtor is not in the military service.

3.       The Debtor is the owner of the following described real property (the "Property"):

ALL THE REAL PROPERTY, TOGETHER WITH IMPROVEMENTS, IF ANY, SITUATE, LYING AND BEING IN THE COUNTY OF LARIMER AND STATE OF COLORADO, DESCRIBED AS FOLLOWS: LOT 4 UNIVERSITY ACRES FIRST SUBDIVISION, ACCORDING TO THE RECORDED PLAT PLAT THEREOF CITY OF FORT COLLINS, COUTNY OF LARIMER, STATE OF COLORADO.

Purported common address: 1501 Stover Street, Fort Collins, CO 80524

4.       By virtue of this bankruptcy filing, the Property is considered to be an asset of the bankruptcy estate.

5.       On or about August 10, 2007, the Debtor executed a promissory note (the "Note") in the original principal amount of $56,000.00.  On or about August 10, 2007, the Debtor executed a Deed of Trust which created a security interest in the Property.  The Deed of Trust was recorded on August 27, 2007 at reception number 20070065588 in the records of the Larimer County Clerk and Recorder.  The Deed of Trust has been assigned to Movant.  A copy of the Note, Deed of Trust and Assignments are attached here to Exhibit A, B and C respectfully.

6.       Select Portfolio Servicing, Inc. services the loan on the Property referenced in this Motion.  In the event the automatic stay in this case is modified, this case dismisses, and/or the Debtor obtains a discharge and a foreclosure action is commenced on the mortgaged property,

the foreclosure will be conducted in the name of Movant or Movant's successor or assignee. Movant, directly or through an agent, has possession of the Note. The Note is either made payable to Movant or has been duly endorsed. Movant is the original mortgagee or beneficiary or the assignee of the Mortgage/Deed of Trust.

7.    The amount due Movant pursuant to the terms of the Note and Deed of Trust as of April 22, 2020 is $46,056.17.

8.    The value of the property as listed in the Debtors' Schedule A/B Property is $275,000.00.

9.    Pursuant to the Debtors' Schedule C, the Debtor is claiming an exemption in the Property that is the Debtor's(s') primary residence.

10.    Pursuant to 11 U.S.C. §554(b), an interested party may move for abandonment of property of the estate where such property has little or no value to the bankruptcy estate or where such property is burdensome to the bankruptcy estate.

11.    Movant is an interested party due to its status a holder of a secured claim against the Property. Pursuant to the Debtor's Schedule D, there is an additional secured mortgage lien in the amount of $307,042.00 in favor of BDG International, Inc; a mortgage lien in the amount of $305,846.00 in favor of Bank of the West; and a mortgage lien in the amount of $95,401.00 in favor of Bank of America Home Loans. Therefore, the property is of no or inconsequential value and benefit to the bankruptcy estate, and preservation of the property is burdensome to the estate.

12.    On June 21, 2018, the Debtor was granted a discharge, therefore terminating the automatic stay protections as to the Debtor pursuant to 11 U.S.C. §362(c)(2)(C).

WHEREFORE, TOWD Point Mortgage Trust 2019-2, U.S. Bank National Association, as Indenture Trustee respectfully requests the Court enter an order deeming the Property to be abandoned by the Chapter 7 Trustee, and for such further relief as the Court deems proper.

Dated: April 27, 2020

Respectfully Submitted,
Halliday, Watkins & Mann, P.C.

*/s/ Heather L. Deere*
Heather L. Deere, #28597
Attorney for Movant
355 Union Boulevard, Suite 250
Lakewood, CO 80228
(303) 274-0155
bankruptcyco@hwmlawfirm.com
File No. 81285-SPS

## UNSWORN DECLARATION OF MILITARY SERVICE UNDER PENALTY OF PERJURY

I, Heather L Deere, attorney at Halliday, Watkins & Mann, P.C. and being over the age of 18, hereby declares in accordance with the Servicemembers Civil Relief Act ("SCRA") as follows:

In support of this Declaration, a search of the Department of Defense Manpower Data Center for the military status of Robert Joseph Bowers, the Debtor in Case No. 17-15526-CDP on April 27, 2020. The search indicated that there was no information, as to all branches of the military, that the Debtor(s) are persons currently on active duty.

I have personally reviewed the searches detailed above and I declare based on my personal knowledge and under penalty of perjury the facts contained in the declaration are true and corrected.

Executed On: April 27, 2020

Halliday, Watkins & Mann, P.C.

/s/ Heather L. Deere
Heather Deere
355 Union Boulevard, Suite 250
Lakewood, CO 80228
(303) 274-0155
(303) 274-0159 (fax)
bankruptcyco@hwmlawfirm.com
File No. 81285-SPS

Department of Defense Manpower Data Center

Results as of : Apr-27-2020 10:00:28 AM

SCRA 5.4



## Status Report
## Pursuant to Servicemembers Civil Relief Act

SSN:              XXX-XX-5265
Birth Date:
Last Name:        BOWERS
First Name:       ROBERT
Middle Name:      JOSEPH
Status As Of:     Apr-27-2020
Certificate ID:   J51G5C4H25XZPPF

| On Active Duty On Active Duty Status Date | | | |
|---|---|---|---|
| Active Duty Start Date | Active Duty End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects the individuals' active duty status based on the Active Duty Status Date | | | |

| Left Active Duty Within 367 Days of Active Duty Status Date | | | |
|---|---|---|---|
| Active Duty Start Date | Active Duty End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects where the individual left active duty status within 367 days preceding the Active Duty Status Date | | | |

| The Member or His/Her Unit Was Notified of a Future Call-Up to Active Duty on Active Duty Status Date | | | |
|---|---|---|---|
| Order Notification Start Date | Order Notification End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects whether the individual or his/her unit has received early notification to report for active duty | | | |

Upon searching the data banks of the Department of Defense Manpower Data Center, based on the information that you provided, the above is the status of the individual on the active duty status date as to all branches of the Uniformed Services (Army, Navy, Marine Corps, Air Force, NOAA, Public Health, and Coast Guard). This status includes information on a Servicemember or his/her unit receiving notification of future orders to report for Active Duty.

*Michael V. Sorrento*

Michael V. Sorrento, Director
Department of Defense - Manpower Data Center
400 Gigling Rd.
Seaside, CA  93955

The Defense Manpower Data Center (DMDC) is an organization of the Department of Defense (DoD) that maintains the Defense Enrollment and Eligibility Reporting System (DEERS) database which is the official source of data on eligibility for military medical care and other eligibility systems.

The DoD strongly supports the enforcement of the Servicemembers Civil Relief Act (50 USC App. ? 501 et seq, as amended) (SCRA) (formerly known as the Soldiers' and Sailors' Civil Relief Act of 1940).  DMDC has issued hundreds of thousands of "does not possess any information indicating that the individual is currently on active duty* responses, and has experienced only a small error rate.  In the event the individual referenced above, or any family member, friend, or representative asserts in any manner that the individual was on active duty for the active duty status date, or is otherwise entitled to the protections of the SCRA, you are strongly encouraged to obtain further verification of the person's status by contacting that person's Service. Service contact information can be found on the SCRA website's FAQ page (Q33) via this URL: https://scra.dmdc.osd.mil/faq.xhtml#Q33.  If you have evidence the person was on active duty for the active duty status date and you fail to obtain this additional Service verification, punitive provisions of the SCRA may be invoked against you.  See 50 USC App. ? 521(c).

This response reflects the following information:  (1) The individual's Active Duty status on the Active Duty Status Date (2) Whether the individual left Active Duty status within 367 days  preceding the Active Duty Status Date (3) Whether the individual or his/her unit received early notification to report for active duty on the Active Duty Status Date.

## More information on "Active Duty Status"
Active duty status as reported in this certificate is defined in accordance with 10 USC ? 101(d) (1).  Prior to 2010 only some of the active duty periods less than 30 consecutive days in length were available.  In the case of a member of the National Guard, this includes service under a call to active service authorized by the President or the Secretary of Defense under 32 USC ? 502(f) for purposes of responding to a national emergency declared by the President and supported by Federal funds.  All Active Guard Reserve (AGR) members must be assigned against an authorized mobilization position in the unit they support.  This includes Navy Training and Administration of the Reserves (TARs), Marine Corps Active Reserve (ARs) and Coast Guard Reserve Program Administrator (RPAs).  Active Duty status also applies to a Uniformed Service member who is an active duty commissioned officer of the U.S. Public Health Service or the National Oceanic and Atmospheric Administration (NOAA Commissioned Corps).

## Coverage Under the SCRA is Broader in Some Cases
Coverage under the SCRA is broader in some cases and includes some categories of persons on active duty for purposes of the SCRA who would not be reported as on Active Duty under this certificate.  SCRA protections are for Title 10 and Title 14 active duty records for all the Uniformed Services periods. Title 32 periods of Active Duty are not covered by SCRA, as defined in accordance with 10 USC ? 101(d)(1).

Many times orders are amended to extend the period of active duty, which would extend SCRA protections. Persons seeking to rely on this website certification should check to make sure the orders on which SCRA protections are based have not been amended to extend the inclusive dates of service. Furthermore, some protections of the SCRA may extend to persons who have received orders to report for active duty or to be inducted, but who have not actually begun active duty or actually reported for induction.  The Last Date on Active Duty entry is important because a number of protections of the SCRA extend beyond the last dates of active duty.

Those who could rely on this certificate are urged to seek qualified legal counsel to ensure that all rights guaranteed to Service members under the SCRA are protected

WARNING:  This certificate was provided based on a last name, SSN/date of birth, and active duty status date provided by the requester.  Providing erroneous information will cause an erroneous certificate to be provided.

Exhibit A



Countrywide Bank, FSB.

Prepared by: LANI M. PUGA

DATE:        08/09/2007
BORROWER: ROBERT J. BOWERS
CASE #:
LOAN #:
PROPERTY ADDRESS: 1501 STOVER STREET
                  FORT COLLINS, CO 80524

4601 DTC BLVD SUITE 150
DENVER, CO 80237

**HOME EQUITY CREDIT LINE AGREEMENT AND
DISCLOSURE STATEMENT**

Date: AUGUST 10, 2007

This Home Equity Credit Line Agreement and Disclosure Statement ("Agreement") governs my Home Equity Credit Line Account ("Account") with you,
Countrywide Bank, FSB.
The words "I," "me" and "my" refer to the Borrower signing this Agreement. If more than one Borrower signs this Agreement, the words "I," "me" and "my" refer to all who sign, separately and together. The words "you" and "your" refer to
Countrywide Bank, FSB.

**1. LOANS: DRAW AND REPAYMENT PERIOD.** Subject to the limitations explained in this Agreement, upon my request for loans, you agree to lend money to me from time to time until the last day of the sixtieth (60th) consecutive calendar month following the date set forth above ("Initial Draw Period,") or until the last day of any renewed Draw Period, up to my Credit Limit indicated in paragraph 5 below. (You will not make any loans if my Account is sooner terminated or suspended under paragraphs 12.B, 12.D, 13.B or 16.A below.) You will not make any loan before the fourth business day following the signing of this Agreement, except to the extent of proceeds of this loan that are for the purchase or initial construction of the Property.

I agree that prior to the end of the Initial Draw Period, you have the right to review my Account to decide whether such Initial Draw Period will be renewed. Unless you have sent me written notice not later than the sixtieth (60th) day before the Initial Draw Period ends that you have decided not to renew such Initial Draw Period, such Initial Draw Period will automatically renew for one additional sixty (60) month period, and the Draw Period on my Account shall thereafter be considered to be 120 months for purposes of this Agreement. If the Initial Draw Period is not renewed, then the Draw Period on my Account shall thereafter be considered to be 60 months for purposes of this Agreement.

After the Draw Period ends, I will no longer be able to obtain loans and then must pay the outstanding balance over the specified Repayment Period unless my Account is sooner terminated under paragraph 13.B below, in which case my Account is due and payable in full at the time of such termination. The Repayment Period shall be 180 months.

**2. MAKING LOANS.** You will make loans under this Agreement (up to my Available Credit Limit) by (i) honoring Equity Credit Line Checks you provide to me requesting advances of at least $250; (ii) if you issue an access card ("Card"); by honoring advances I request by using the Card at any Merchant or servicer provider ("Merchant") at any participating automated teller ("ATM") networks; (iii) paying closing costs and finance charges in accordance with paragraph 8.C below; (iv) paying certain other amounts on my behalf in accordance with my disbursement authorization provided to you at or before the time I sign this Agreement; (v) paying any unpaid taxes, assessments, property insurance or other sums as provided under this Agreement or the Mortgage; or (vi) any other method or procedure you establish.

**3. SPECIAL CARD TERMS AND CONDITIONS.** I understand that you, in your sole discretion and at your sole option, may cause to be issued a Card, as an access device and an additional means by which I may obtain advances under the Account. By applying for the Account, I have requested that you issue the Card to me if my application is approved and if you, at your option and in your sole discretion, provide access to my/our Account by the Card after the Account is opened. If one or more Cards are issued to me as a means of obtaining loan advances on my Account, I agree that my use of the Card and any related loan advances will be governed by the following terms and conditions unless I cancel my card within [30] days of receiving the Card and have not authorized the use of the Card or Card account number. I also agree to comply with any agreement between me and the Card Issuer:

A: _Account Access._ In addition to any means by which I may access my Account as described in the Agreement, I may be permitted to obtain (up to my Available Credit Limit) loan advances by using any Card you provide, at any merchant or service provider ("Merchant") that allows me to use the Card to pay for goods or services. If you provide me with a Personal Identification Number ("PIN"), I may also obtain loan advances by using the Card

* HELOC – CO Agreement & Disclosure Statement
2C615-CO (08/06)(d)

Page 1 of 10



at participating automated teller machine ("ATM") networks. I agree not to write my PIN on my Card(s) or disclose it to others. If I use my Card at an ATM, I understand that the owner of the ATM may charge me a fee for the transaction. I understand that in order to use my Card at an ATM, I must call 1-800-669-5884 to request a PIN. I also understand that Card loan advances (whether at a Merchant or ATM) may be subject to transactional limits that could restrict the full use of my Available Credit Limit. There are no minimum draw requirements that apply when I use the Card, except for any limits that may be imposed separately by a Merchant or ATM owner. I agree that if you decide in your sole discretion to approve any transactions above my Available Credit Limit, I will be responsible for the full amount of any such advances. I understand that if I make reservations or purchases of any kind using my Card, my Account may be immediately charged for the full amount of the reservation or purchase, regardless of whether I have received the goods or services requested at the time my Account is charged.

B. Liability. I agree that all borrowers who have executed the Agreement are jointly and severally liable under the terms of the Agreement for any Card transactions that are posted to the Account, whether or not a Card has been issued to all borrowers.

C. Authorizations. All Card transactions are processed through the applicable bankcard networks that are branded on the Card ("Bankcard Networks") according to the requirements and procedures of the Bankcard Networks. Some Card transactions may require prior authorization by us or pursuant to the requirements and procedures of the Bankcard Networks before they are approved for processing. The Bankcard Networks may refuse to process any Card transaction if it appears to be illegal or fraudulent, or if the Merchant or the transaction does not otherwise meet the requirements of the Bankcard Networks. In addition, you or the Card Issuer may deny authorization for any Card transaction if my Account has been suspended or terminated. I also agree that if you or the Card Issuer detects any suspicious or unusual use, you or the Card Issuer may suspend use of any Card.

D. Lawful Transactions. I agree to use my Card only for valid and lawful purposes. If I use my Card for any other purpose or transaction (herein called a "Prohibited Activity"), including, without limitation, gambling activities, I agree to promptly reimburse you, the Card Issuer (if other than you) and the Bankcard Networks for all amounts or expenses paid by any such party as a result of such use. You reserve the right to block any Prohibited Activity and/or to not approve any authorization request for a Prohibited Activity. Card transactions for any Prohibited Activity made by me or for my benefit shall be considered authorized by me. You will not be liable if I engage in any Prohibited Activity using the Card, and I will be responsible for the full amount of any loan advances made in connection with such Prohibited Activity. Display by an online merchant of the service mark of any Bankcard Network branded on the Card does not mean that a Card transaction over the Internet is legal where I reside.

E. Transactions With Merchants. I understand and agree that: (1) if a Merchant discloses a policy such as "no returns", "no refund", "no return or credit without receipt", "as is", "store credit only", "all sales final", or similar language, I will be bound by that policy when I use my Card to pay for goods or services from that Merchant; (2) When using my Card to make travel or lodging reservations, I must obtain the Merchant's cancellation policy and follow it if I cancel the reservations. If I cancel, I must obtain the cancellation number that the Merchant is required to give me pursuant to the requirements and procedures of the Bankcard Networks. The Merchant may charge me for a cancelled transaction unless I can provide you with a correct cancellation number. (3) If I authorize a Merchant to charge repeat transactions to my Account without my presenting my Card for each charge, then I must notify the Merchant when I want to discontinue the repeat transactions or if my Account is suspended or closed. Otherwise, I will be responsible to you for the amount of all such repeat transactions. I understand that if my loan advance privileges or my use of the Card is suspended or cancelled for any reason, it is my responsibility to pay for such repeat transactions directly, until loan advance privileges and/or Card use are reinstated. (4) If I disagree with any transaction on my monthly statement or have a dispute with any Merchant as a result of a Card transaction, I agree to comply with the section entitled MY BILLING RIGHTS — I SHOULD KEEP THIS NOTICE FOR FUTURE USE in my Agreement. I will promptly provide you with such information or assistance as you reasonably request.

F. Foreign Transactions. I agree to pay you in U.S. dollars. If I make a Card transaction in a foreign currency, the appropriate Bankcard Network will convert the transaction amount into U.S. dollars at the rates, and in accordance with its operating regulations in effect at the time the transaction is processed. Currently, the regulations of the Bankcard Networks provide that the currency conversion rate to be used is either a wholesale market rate selected by the Bankcard Networks or a government-mandated rate, each in effect one day prior to the processing date, plus an adjustment factor (currently 1%) established by the Bankcard Networks. The Bankcard Networks may change the currency conversion rate, and the formula used to establish that rate, from time to time. The currency conversion rate in effect on the processing date may differ from the rate in effect on the transaction date or the posting date. The currency conversion rate used may be the same as, greater than or less than the amount that would be calculated by conversion through a financial institution in the country in which the transaction occurred. I understand that you do not determine the currency conversion rate or the formula to establish the rate that is used by the Bankcard Networks and that you do not receive any portion of the currency conversion rate used by the Bankcard Networks.

**G.** **Limitation of Liability.** Your liability to me, if any, for wrongful dishonor of any loan request I make using my Card is limited to my actual damages. I also agree that you are not responsible if any transaction is not approved, whether by you, a Merchant, Bankcard Network, or a third party, even if I have sufficient credit available.

**H.** **Termination/Suspension of Account.** Upon any termination or cancellation of my Account by you or by me, or any suspension of my loan advance privileges under this Agreement, I agree that all Cards will be destroyed by me upon your instruction, or may be retrieved by you or your agent.

**I.** **Cancellation/Expiration of Cards.** I may be permitted to use the Card to access my account only so long as the access card program remains active and you permit me to participate in the program. If more than one person has executed the Agreement, any one of us may request that our Cards be cancelled. The request, at your option, may be made verbally or in writing. You may also cancel any Card at your sole discretion at any time, including if (1) the contracts with current or future providers of services used to operate the Card program expire or are terminated; or (2) I have not used my Card to obtain a loan advance on my Account at least once during any 12 month period; (3) my card is lost, stolen, or otherwise subject to unauthorized use; or (4) any part of the Program, including use of the Card, is prohibited by applicable law. I understand and agree that the terms governing my ability to obtain loan advances during the Initial Draw Period and any renewed Draw Period are set forth in the Agreement and that these terms supercede any inconsistent expiration date(s) printed on any Cards that are issued to me to the extent that such expiration date(s) is (are) later than the expiration date of any Draw period defined in the Agreement.

**J.** **Lost or Stolen Cards.** I agree to promptly notify you at 1-800-556-5678 if any Card is lost or stolen, or if I suspect unauthorized use. You reserve the right not to honor any loan advance request made using a Card if any of my Cards has been cancelled or reported lost or stolen.

**K.** **Unauthorized Transactions.** I will not be liable for the unauthorized use of my Card. I agree to assist you in your investigation of any claims of unauthorized Card transactions and understand that I may be required to provide you with a written statement and/or an Affidavit of Forgery. I agree that if I permit a person to use the Card or Card account number, or if I benefit from another person's use of the Card or Card account number, such use is not unauthorized use of the Card, even if I did not intend to be responsible for such use.

**L.** **Special Rule for Card Purchases.** The following is in addition to the notice at the end of the Agreement entitled MY BILLING RIGHTS – I SHOULD KEEP THIS NOTICE FOR FUTURE USE:
> **Special Rule for Card Purchases.**
> If I have a problem with the quality of property or services that I purchased with my Card, and I have tried in good faith to correct the problem with the merchant, I may have the right not to pay the remaining amount due on the property or services. There are two limitations on this right:

    (a)   I must have made the purchase in my home state or, if not within my home state, within 100 miles of my current mailing address; and

    (b)   The purchase price must have been more than $50. These limitations do not apply if you or the Card issuer own or operate the merchant, or if you or the Card issuer mailed me the advertisement for the property or services.



**4. PROMISE TO PAY; MINIMUM PAYMENT; METHOD OF PAYMENT.**

**A.** I promise to pay to your order, when and as due, all loans made under this Agreement, plus all unpaid finance charges, insurance premiums, collection costs and other charges I owe to you now or in the future. I agree to make my payments in the manner specified in my periodic statement, and if I do so such payments will be credited as of the day of receipt.

**B.** At a minimum, you will send me a periodic statement at the end of each billing cycle in which there is a debit or credit balance of more than one dollar ($1.00) or in which a finance charge has been imposed. The periodic statement will show all Account activity during the billing cycle and contain other important information, including my "New Balance," my Annual Percentage Rate, the amount of my "Minimum Payment Due," my "Payment Due Date" and the place and manner of making payments.

**C.** I may pay all or any part of my "New Balance" at any time, without penalty.

**D.** Unless you terminate my Account and require immediate payment of the entire outstanding balance as provided in paragraph 13.B below, I must pay you at least the "Minimum Payment Due" for each billing cycle by the "Payment Due Date" shown on my periodic statement.

**E.** During the Draw Period, my "Minimum Payment Due" equals all unpaid finance charges, credit life insurance premiums and other charges imposed during the billing cycle together with any "Amount Past Due." My "Minimum Payment Due" during the Draw Period will not reduce the principal balance that is outstanding on my Account.



F. During the Repayment Period, if the Draw Period on my Account is 60 months or 120 months, my "Minimum Payment Due" equals 1/180th of the outstanding principal balance of my Account as of the last day of the Draw Period plus all unpaid finance charges, credit life insurance premiums and other charges imposed during the billing cycle together with any "Amount Past Due."

**5. CREDIT LIMIT.** My Credit Limit under this Agreement is $ 56,000.00 . I promise not to request a loan which will cause the unpaid principal balance of my Account to exceed my Credit Limit. You can increase the Credit Limit at any time without prior notice to me. You can refuse to make loans that cause my obligations under this Agreement to exceed my Credit Limit. You will make loans on my Account based on the "Available Credit Limit" shown on my most recent periodic statement. However, I agree that when I make payments on my Account by check or other non-cash method, you reserve the right to make loans based on the "Available Credit Limit" shown on the last periodic statement issued prior to the most recent periodic statement. In addition to each "Minimum Payment Due," I must pay immediately, without notice or demand from you, any part of the principal balance of my Account that exceeds my Credit Limit.

**6. ANNUAL PERCENTAGE RATE.**

☐ A. The initial Daily Periodic Rate is N/A %. The initial ANNUAL PERCENTAGE RATE is N/A %. These rates are "discounted" rates. This means that these rates are lower than the rates that would be in effect if the formula set forth in paragraph 6.C below had been used, in which event the initial Daily Periodic Rate would be N/A % and the initial ANNUAL PERCENTAGE RATE would be N/A %. These discounted rates will be in effect from the date of this Agreement until N/A . Thereafter, the Daily Periodic Rate and the Annual Percentage Rate will be determined using the formula set forth in paragraph 6.C below.

☒ B. The initial Daily Periodic Rate is 0.02842 % and the initial ANNUAL PERCENTAGE RATE is 10.375 %. These rates are not discounted.

C. My Annual Percentage Rate and Daily Periodic Rate may increase or decrease (the first day after my "discounted" rate has expired, if applicable) according to the following procedure: The ANNUAL PERCENTAGE RATE shall be the "Index" plus a "Margin." The "Index" will be the highest Prime Rate as published in the "Money Rates" table of *The Wall Street Journal* as of the first business day of the calendar month. The "Margin" is equal to the number of percentage points disclosed in paragraph 6.D below. Each billing cycle will end on the last day of the calendar month. Any new index value shall be effective as of the first day of the billing cycle in which such new index value is established.

Upon a change in the Index, any resulting change in my Daily Periodic Rate and Annual Percentage Rate will take effect without prior notice to me, and will apply to new loans and to the outstanding principal balance in my Account. The new Annual Percentage Rate and Daily Periodic Rate will apply to my then existing unpaid principal balance and all new loans I obtain until my Annual Percentage Rate and Daily Periodic Rate change again. The Daily Periodic Rate at any time equals the ANNUAL PERCENTAGE RATE divided by 365.

D. The "Margin" to be used under paragraph 6.C above to determine my ANNUAL PERCENTAGE RATE is 2.125 percentage points.

E. The Annual Percentage Rate is a simple interest rate. The Annual Percentage Rate includes only interest and not other costs. The ANNUAL PERCENTAGE RATE will never increase above 18.000 % or the maximum rate permitted by law, whichever is less.

F. If the Daily Periodic Rate (and the corresponding Annual Percentage Rate) increases, I will have to pay additional periodic finance charges and, as a result, I will have to pay larger "Minimum Payments."

**7. FINANCE CHARGE.** I agree to pay a finance charge on my Account as explained below.

A. Periodic FINANCE CHARGE.

(1) A loan represented by an Equity Credit Line Check will be posted to my Account on the date that such a check is presented to you for payment. Any loan advance represented by a Card transaction will be posted to my Account as of the date that you receive the transaction for processing. The periodic finance charge begins to accrue on my Account from the time a loan is posted to my Account. There is no grace period during which I can repay loan advances without incurring a periodic finance charge.

(2) You compute the periodic finance charge on my Account by applying the Daily Periodic Rate to the "Average Daily Balance" in my Account (including current transactions). To determine the periodic finance charge for any billing cycle, the "Average Daily Balance" is multiplied by the Daily Periodic Rate, then this product is multiplied by the number of days in the billing cycle.



**(3)** To get the "Average Daily Balance," you take the beginning principal balance of my Account each day, add any new loans and subtract any principal payments or credits. This gives you the Daily Balance. Then you add up all the Daily Balances for the billing cycle and divide by the total number of days in the billing cycle. This gives you the "Average Daily Balance."

**B. Other FINANCE CHARGES.**

**(1) Points FINANCE CHARGE.**

I agree to pay a Points FINANCE CHARGE of $ 0.00    at the time I sign this Agreement.

| | $ |
| --- | --- |
| | $ |
| | $ |
| | $ |

**(2) Broker Fee FINANCE CHARGES.**

I agree to pay Broker Fee FINANCE CHARGES of $N/A    at the time I sign this Agreement.

| | $ |
| --- | --- |
| | $ |
| | $ |
| | $ |

**(3) Settlement Agent FINANCE CHARGES.**

I agree to pay the following Settlement Agent FINANCE CHARGES at the time I sign this Agreement:

| Closing Fee | $ | 405.00 |
| --- | --- | --- |
| | $ | |
| | $ | |
| | $ | |
| | $ | |
| | $ | |

**(4) Miscellaneous FINANCE CHARGES.**

I Agree to pay the following miscellaneous FINANCE CHARGES at the time I sign this Agreement:

| | $ |
| --- | --- |
| | $ |
| | $ |

**(5) Annual Maintenance Fee FINANCE CHARGE.**

☐ I agree to pay an annual maintenance fee FINANCE CHARGE of $ 0.00    which you will charge to my Account on the first anniversary of this Agreement and every anniversary date thereafter, whether or not I have used or continue to use my Account; except that such fee shall be waived for the entire term of this Agreement if I meet both of the following conditions: (a) I maintain an average outstanding daily balance which does not fall below $ _____ from the date of this Agreement through the first anniversary of this Agreement; and (b) I make each monthly payment during that period on or before the due date for each such payment. You will not rebate any portion of the annual fee if my Account is terminated or suspended before the end of any annual period.

☒ I will not be charged an annual maintenance fee FINANCE CHARGE on this loan.

● HELOC - CO Agreement & Disclosure Statement
2C615-CO (08/06)    Page 5 of 10

**8. OTHER CHARGES.**

A. I agree to pay each of the charges listed below, which shall constitute additional indebtedness under this agreement. Any charges assessed will be shown on my periodic statement for the billing cycle in which such charge is assessed:

(1) If I fail to make my "Minimum Payment Due" within **fifteen (15)** days of the "Payment Due Date," I agree to pay a late fee of 5% of the late payment.

(2) I agree to pay a Return Item Fee of $15 for each check you receive in payment of my Account which is returned unpaid upon second presentment.

B. I agree to pay the following closing costs at or before the time I sign this Agreement:

| | |
|---|---|
| Credit Report Fee | $ 35.00 |
| Title Insurance | $ 45.00 |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| LESS Amounts Paid by Lender | $ 0.00 |
| Total Paid by Borrower | $ 485.00 |

C. I may elect to pay the closing costs described in paragraph 8.B above and the finance charges described in paragraph 7.B above in cash or by check at or before the time I sign this Agreement or I may elect to finance some or all of such costs and finance charges by allowing you to make a loan under my Account to pay some or all of such costs and finance charges.

D. I will not be charged an Account Termination Fee on this loan.

**9. REAL PROPERTY SECURITY.** To secure the payment of all loans I obtain and the performance of all promises I make in this Agreement, I and all co-owners are giving you a Deed of Trust (the "Deed of Trust") covering my dwelling located at
1501 STOVER STREET, FORT COLLINS, CO 80524
(the "Real Property"). The Deed of Trust is security for my current and future obligations under this Agreement. I will continue to be obligated to make payment to you under this Agreement even if the Real Property is damaged or destroyed and whether or not any insurance proceeds are available.

**10. SECTION INTENTIONALLY OMITTED.**

**11. PROPERTY INSURANCE.** I agree to obtain and maintain property insurance against loss or damage to the Real Property, in such amounts, against such risks (including, but not limited to, flood damage insurance required by law), and according to such terms as you may require in the Mortgage or otherwise. I may obtain property insurance from any company of my choice that is acceptable to you. If the amount of the premiums for property insurance increases at any time during the term of my Account, I agree to pay any such increase(s).

**12. YOUR RIGHTS TO TEMPORARILY SUSPEND MY LOANS OR REDUCE MY CREDIT LIMIT.**

A. You may take the actions listed in paragraph 12.B below during the period that any of the following events or conditions occur:

(1) the value of the Real Property declines significantly below its appraised value for the purposes of my Account;

(2) you reasonably believe that I will not be able to meet the repayment requirements under my Account due to a material change in my financial circumstances, such as the filing of a bankruptcy petition by or against me;

● HELOC - CO Agreement & Disclosure Statement
2C616-CO (08/00)

Page 6 of 10

(3)  I am in default of any material obligation of this Agreement, such as my important obligations listed in paragraph 14 below;

(4)  government action (such as enactment of a state usury law) prevents you from imposing the Annual Percentage Rate provided for in this Agreement;

(5)  government action (such as imposition of a tax lien) impairs the priority of the lien of the Mortgage such that the value of the lien of the Mortgage is less than 120% of my Credit Limit;

(6)  the maximum Annual Percentage Rate set forth in paragraph 6.E above is reached;

(7)  the creditor is notified by its regulatory agency that continued advances constitute an unsafe and unsound practice.

B.  During the period in which a condition described in paragraph 12.A above occurs, you may refuse to make any additional loans or reduce my Credit Limit or do both. You will mail or deliver written notice to me after you suspend my Account or reduce my Credit Limit and this notice will describe the specific reasons for your action. You are obligated to reinstate my credit privileges when the condition(s) which caused the suspension or reduction have been cured or have changed, provided I have notified you in writing, explaining in detail and documenting how the condition(s) have been cured or have changed and no new condition(s) under paragraph 12.A above or 13.A below have occurred.

C.  Before reinstating my right to obtain loans, or restoring my Credit Limit, you may conduct such searches, verifications and evaluations (such as credit reports, appraisals and lien searches) as you deem appropriate, and you may require me to reimburse you on demand for any costs you actually incur for obtaining credit reports and appraisals. You may take these steps to verify that (i) the condition(s) that caused your suspension of my loans or reduction of my Credit Limit no longer exist, and (ii) the priority of the lien of the Mortgage is not impaired.

D.  If more than one Borrower signs this Agreement and any such Borrower requests that you cease making loans, you may comply with such a request. All Borrowers who have signed this Agreement must join in any request to reinstate the loans for such request to be effective. If all such persons subsequently request reinstatement of the loans, you must honor such a request unless a condition listed in paragraph 12.A above or 13.A below has occurred.

E.  If an event or condition described in paragraph 12.A above occurs which is also an event or condition described in paragraph 13.A below, your rights and remedies described under paragraph 13.B below apply and supercede your rights described in this paragraph 12.

**13. YOUR RIGHTS TO TERMINATE AND ACCELERATE MY ACCOUNT AND TAKE OTHER ACTION.**

A.  You may take the actions listed in paragraph 13.B below if any of the following events or conditions occur:

(1)  I fail to meet the repayment terms of this Agreement, such as my failure to make any Minimum Payment Due to you on or before the Payment Due Date;

(2)  I engage at any time in fraud or material misrepresentation in connection with my Account, whether in any application, in this Agreement or in the Mortgage;

(3)  I sell or transfer title to the Real Property without first obtaining your written permission;

(4)  I fail to maintain insurance on the Real Property as required under this Agreement or the Mortgage;

(5)  I act or fail to act and as a result a lien senior to the lien of the Mortgage is filed against the Real Property;

(6)  I die and I am not survived by another person obligated as a Borrower under this Agreement;

(7)  All or part of the Real Property is taken through eminent domain, condemnation or similar government taking;

(8)  A prior lienholder on the Real Property begins foreclosure under its security document;

(9)  The Real Property is used for an illegal purpose which could subject the Real Property to seizure;

(10)  I fail to pay taxes on the Real Property; or

(11)  My action or inaction adversely affects the Real Property or your rights in the Real Property. Such action or inaction could include, for example, the following:




    (a)   A judgment is filed against me;

    (b)   I commit waste or otherwise destructively use or fail to maintain the Real Property;

    (c)   I die and I am survived by another person obligated as a Borrower under this Agreement; or

    (d)   I move out of the Real Property.

   B. If an event described in paragraph 13.A above occurs, subject to any notice or other limitation of applicable law, you may do any combination of the following things:

    (1)   you may terminate any of my rights under my Account;

    (2)   you may temporarily or permanently refuse to make any additional loans;

    (3)   you may declare all sums owing under this Agreement and any other agreement I have made with you to be immediately due and payable;

    (4)   you may foreclose the Mortgage;

    (5)   you may reduce my Credit Limit; and

    (6)   you may take any other action permitted by this Agreement, by law or in equity.

**14. MY IMPORTANT OBLIGATIONS.** I agree that:

   A. I will pay all of my existing and future debts to you under any existing or future agreement with you and I will pay all of my existing and future debts to my other creditors as they become due and will not allow a creditor to obtain a judgment against me.

   B. I will not permit any person or entity to levy upon, attach, garnish or otherwise take any money, account or other property in your possession that belongs to me.

   C. From time to time, if requested, I will supply you with current financial information about me.

   D. I have not made and will not make any misrepresentation in connection with my Account whether in my application, in this Agreement, or in the Mortgage.

   E. I will not permit a receiver, sequestrator, liquidator, trustee, guardian, conservator or other judicial representative to be appointed for me or any of my property or for the Real Property.

   F. I will not use or allow use of the Real Property for any illegal purpose.

   G. I will not move out of the Real Property.

   H. I will not permit a lien to be filed which takes priority over the Mortgage for future advances made under this Agreement.

   I. I will not break any promise made in this Agreement or in the Mortgage such as:

    (1)   my promise not to exceed my Credit Limit; and

    (2)   my "Important Obligations" listed in the Mortgage.

**15. COSTS OF COLLECTION.** Subject to any limits of applicable law, I must pay for your reasonable attorney's fees not in excess of 16% of my unpaid debt after default if referred to an attorney who is not your salaried employee. Periodic finance charges will continue to accrue at the rates provided in this Agreement before and after I default and before and after you obtain a judgment against me.

**16. MY RIGHTS TO TERMINATE MY RIGHTS TO OBTAIN LOANS.**

   A. <u>Termination by Me.</u> I may terminate my right to obtain loans by sending you a written notice which will become effective upon receipt by you. If more than one person signs this Agreement as Borrower, my right to obtain loans may be terminated by written notice pursuant to this paragraph 16.A signed by any one or more of such persons. I may also suspend my right to obtain loans pursuant to paragraph 12.D above.

**B. Termination by You.** My right to future advances under my Account will terminate at the end of the Draw Period or any renewed Draw Period if not sooner upon your exercise of your termination or suspension rights under paragraphs 12.B or 13.B above or my exercise of my suspension or termination rights under paragraphs 12.D or 16.A above.

**C. Effect of Termination.** Upon termination or suspension of my Account, whether by you or by me, I must continue to pay the "Minimum Payment Due" on or before my "Payment Due Dates" until all amounts owed to you under this Agreement are paid in full. However, I may be required to repay all my obligations to you immediately if you exercise your rights under paragraph 13.B above. I must return unused Equity Credit Line Checks to you upon termination.

**17. CHANGES TO AGREEMENT.**

**A.** You may change this Agreement to the extent not prohibited by federal or state law, such as the changes listed as follows:

(1)   If the original Index is no longer available, you may change the Index and Margin;

(2)   you may make any change I agree to in writing;

(3)   you may make a change which is unequivocally beneficial to me, such as offering me more minimum payment options, extensions or renewals of my Account, reductions in the rate or fees, and additional means to access loans; and

(4)   you may make insignificant changes, such as changing the address to which payments must be sent, name changes, operational changes involving the billing cycle date, the date the Minimum Payment is due, the day of the month on which Index values are measured to determine my rate, your rounding rules and the balance computation method.

**B.** If required by applicable law, you will mail me notice of such a change before the effective date of the change. The change will be effective as to any existing unpaid balance and as to any future transactions under this Agreement.

**18. OTHER PROVISIONS.**

**A. Third Parties.** This Agreement obligates me and my estate, heirs and personal representatives. This Agreement benefits you and your successors and assigns. You may add or release parties, or permit the addition or substitution of real property collateral that secures this Agreement, or modify, extend or amend this Agreement without in any way affecting my or any non-borrower co-owner's obligations under this Agreement. My rights under this Agreement belong only to me. I cannot transfer or assign them to anyone else. You may transfer and assign your rights and obligations under this Agreement and the Mortgage at any time without my consent.

**B. Additional Credit Reports and Appraisals.** I authorize you to conduct such searches, verifications and evaluations (such as credit reports, appraisals and lien searches) concerning me, the Real Property and the Mortgage as you may deem necessary from time to time; I will cooperate in having the Real Property reappraised.

**C. Tax Deductibility.** I know that I should consult a tax adviser regarding the deductibility of interest and charges.

**D. Applicable Law.** I agree that this Agreement is to be governed by federal law and, to the extent not preempted by federal law, by the laws of the state where the Real Property is located.

**E. Application of Payments.** You may apply payments and proceeds of the Real Property in such order as you shall deem advisable or as otherwise required by applicable law.

**F. Failure to Perform.** If I violate or fail to perform any term or condition of this Agreement (or the Mortgage), you may (but are under no obligation to) perform on my behalf. All costs you incur will be added to the unpaid principal of my Account and finance charges will be figured at the rates described above. I agree to pay these costs and finance charges on demand. Your performance of any of my obligations will not be a waiver of any of your rights or remedies under this Agreement.

**G. Waiver of Jury Trial.** I waive my right to a jury trial.

**H. Complete Understanding of the Parties.** There are no oral agreements concerning this Agreement. This Agreement will not be amended or modified orally. If any provision of this Agreement is held to be void or unenforceable, the rest of this Agreement shall remain in effect.

**I. Waiver of Notice.** I waive presentment, demand, protest, notice of default, nonpayment, partial payments and all other notices and formalities in connection with the delivery, acceptance, performance, default or enforcement of this Agreement, except those notices that are required by federal Regulation Z.

**J. Meaning of Words.** All words in this Agreement will be read to be of such gender and number as the context may require. The section headings in this Agreement are for convenience and do not limit or amend any of the Agreement's provisions. Any list of conditions or events in this Agreement preceded by the phrase "such as" is not intended as a full or comprehensive list, but merely as a set of examples of such conditions or events. Other conditions or events are intended to be included to the fullest extent permitted under federal and state law, even if different from the listed conditions or events.

**K. Payment Marked "Payment in Full".** I agree not to submit any checks to you in payment of my Account marked "Payment in Full" or similar wording unless the amount of the check is equal to the total amount then owing on my Account. If I do submit a check to you marked "Payment in Full" or similar wording for a sum less than the total amount then owing on my Account, you may accept it in partial payment of my Account but will not be bound by the "Payment in Full" or similar notation. Communications concerning a dispute as to amounts owing on my Account, including any checks submitted to you as full satisfaction of my Account, must be sent to Countrywide Bank, FSB.
P.O. Box 5170, Simi Valley, CA 93062-5170

**L. Enforcement.** You can accept any late or partial payment or otherwise waive or delay enforcing your rights under this Agreement and still exercise your rights at a later time.

**M. Notices.** Except for any notice required under applicable law to be given in another manner, (a) any notice to me provided for in this Agreement shall be given by delivering it or by mailing such notice to me by regular first class mail, addressed to me at my last address appearing on your records or at such other address as I may designate by written notice to you as provided in this paragraph 18.M and (b) any notice to you provided for in this Agreement shall be given by mailing such notice to you by certified mail, return receipt requested, at Countrywide Bank, FSB.
P.O. Box 5170, Simi Valley, CA 93062-5170
or to such other address as you may designate by written notice to me as provided in this paragraph 18.M.

**N. Riders/Addenda.** The covenants and agreements of each of the riders/addenda checked below are incorporated into and supplement and amend the terms of this Agreement.

☐ No Cost Addendum _____

_____ Addendum            ☐ _____ Rider

☒ Billing Rights Statement            ☐ _____


BY SIGNING BELOW, (1) I AGREE THAT I HAVE READ ALL PAGES OF THIS AGREEMENT INCLUDING ANY RIDERS/ADDENDA, (2) I AGREE AND INTEND TO BE LEGALLY BOUND BY ALL OF ITS TERMS AND CONDITIONS, INCLUDING ANY TERMS AND CONDITIONS LISTED IN ANY RIDERS/ADDENDA, AND (3) I ALSO ACKNOWLEDGE RECEIVING A COMPLETED COPY OF THIS AGREEMENT AND ANY RIDERS/ADDENDA. I ALSO ACKNOWLEDGE THAT I RECEIVED A COPY OF YOUR HOME EQUITY EARLY DISCLOSURE ENTITLED, "IMPORTANT TERMS OF OUR HOME EQUITY LINE OF CREDIT," THE HOME EQUITY BROCHURE ENTITLED, "WHEN YOUR HOME IS ON THE LINE" AND TWO COPIES OF THE HOME EQUITY LINE OF CREDIT NOTICE OF RIGHT TO CANCEL.

Borrower: ROBERT J. BOWERS                         Date  8-10-07

Borrower: CODY BOWERS                              Date  8-10-07

Borrower: _____               Date _____

Borrower: _____               Date _____

Prepared by: LANI M. PUGA

AGENT:

# HOME EQUITY
## CONFIRMATION AGREEMENT

| | |
|---|---|
| ORIGINATION DATE: | 07/12/2007 |
| AGREEMENT DATE: | 07/12/2007 |
| APPLICANT: | ROBERT J. BOWERS |
| CO-APPLICANT: | JUDY BOWERS |
| PROPERTY ADDRESS: | 1502 STOVER STREET |
| | FORT COLLINS, CO 80524 |

**BRANCH #** ▇▇▇▇    4601 DTC BLVD SUITE 150
DENVER, CO 80237

**LOAN NUMBER:** ▇▇▇▇▇▇▇

**LOAN AMOUNT:** 36,000.00

**LOAN TYPE:** HELOC - Stand Alone/ 79.50%/Gold/Cost

| | |
|---|---|
| CONFIRMATION NO.: | ▇▇▇▇ |
| POINTS: | 0.000 |
| AGREEMENT TERM: | 45 Days |
| EXPIRATION DATE: | 08/27/2007 |

**INDEX:** WSJ Prime Rate

**OCCUPANCY:** NON-OWNER OCCUPIED

| MARGIN | CURRENT INDEX | INT. RATE CEILING |
|---|---|---|
| 2.125 | 8.250 | 18.000 |

This Agreement covers only the above described Applicant, property, and loan program and is subject to the following terms and conditions. **YOU MUST SIGN THIS AGREEMENT AND RETURN IT TO THE LENDER WITHIN 10 DAYS OF THE DATE OF THIS AGREEMENT.**

1.  ☐ This home equity line of credit loan is an adjustable rate mortgage loan, and the interest rate is subject to periodic adjustment. The interest rate will be based on the then-current value of the Index plus the Margin shown above. The loan you have applied for also has an Introductory Interest Rate, which may be lower or greater than the rate that you will be required to pay for the remaining term of the loan. Refer to the "Important Terms of Our Home Equity Line of Credit" disclosure for complete information.

    ☒ This home equity line of credit loan is an adjustable rate mortgage loan, and the interest rate is subject to periodic adjustment. The interest rate after closing will be based on the then-current value of the Index plus the Margin shown above. Refer to the "Important Terms of Our Home Equity Line of Credit" disclosure for complete information.

    ☐ This home equity loan is an adjustable rate mortgage loan, and the interest rate is subject to periodic adjustment. The interest rate will be based on the then-current value of the Index plus the Margin shown above. The loan you have applied for also has an Introductory Interest Rate, which may be lower or greater than the rate that you will be required to pay for the remaining term of the loan.

2.  The loan must close, the three-day rescission period (unless such a period is not applicable) must expire, and funds must be disbursed on or before the expiration date set forth above.

3.  Upon loan closing, the Lender must receive a valid first or second lien on the property, as specified in the loan application, and title must be clear, without defects unacceptable to Lender. If required, there must be title insurance in an amount and form acceptable to the Lender.

4.  The Applicant must submit to the Lender a complete loan application, including any additional supporting documentation which the Lender may request in order to enable the Lender to make an underwriting decision.

5.  If this Agreement covers a "reduced-documentation" loan application, the Lender reserves the right, in its discretion, to require the Applicant to submit a complete loan application with any additional supporting documentation which the Lender may request. This may result in delays due to the time the Lender will need to verify the information contained in the complete loan application and/or supporting documentation.

6.  This is not a loan approval or loan commitment. Any program described above may not be available for Applicant. The Lender will not close the loan unless, among other things, it approves the Applicant's loan application, including employment, income, assets, credit and property, and all conditions of such approval are satisfied prior to loan closing.

7.  As of the date of loan closing, the Applicant must have hazard insurance on the property covering the replacement cost of the dwelling with an insurance carrier acceptable to the Lender. If the property is located in a special flood hazard area, flood insurance will be required. If the property includes commonly owned area, a master policy insurance certificate will be required. Insurance against additional perils, including but not limited to earthquake, may also be required.

● Home Equity - Confirmation Agreement
2C769-XX (10/05)(d)

8.  The Applicant must complete or cause to be completed all required construction, tests or repairs prior to loan closing, and the property must be suitable for occupancy. The Applicant must obtain all required inspections or certifications by applicable and appropriate authorities prior to loan closing. These include, but are not limited to, wood-destroying insect inspection, repair and abatement; radon test; well water or septic system acceptance; local occupancy or use permits; and repairs required by the appraiser as a valuation condition.

9.  If this Agreement covers a purchase transaction, the sale must close with each party paying costs and expenses as specified in the copy of the purchase agreement supplied to the Lender. Any changes in such purchase agreement must be approved by the Lender prior to closing.

10. The points specified above  ☐ do  ☒ do not  include all other loan fees, costs and expenses.

11. The Lender estimates that it will take approximately 45    days to process, approve, close and fund the loan. The Lender agrees to use commercially reasonable efforts to fund the loan prior to the expiration date of this Agreement. However, this Agreement is not a commitment to close and fund the loan prior to the expiration date. Delays may occur, and this Agreement may expire prior to loan closing due to a variety of circumstances. Such circumstances include, but are not limited to, unforeseeable or extraordinary events, delays in receipt or failure to receive various required information, documents or fees from either the applicant or third parties, and acts of God. The Lender agrees to exercise reasonable efforts to obtain third-party documentation. Nevertheless, the expiration date of this Agreement shall <u>not</u> be extended as a result of any such circumstances or events.

12. Regardless of whether or not loan documents have been signed, if the Lender discovers a material change in the information provided with respect to the loan, including but not limited to, the borrowers' income, employment, credit or the property, the Lender shall not be obligated to fund the loan, and the expiration date of this Agreement shall not be extended as a result of any such circumstances or events.

13. If the loan does not close and funds are not disbursed prior to the expiration date of this Agreement, the Lender and the Applicant may enter into a new Confirmation Agreement. The interest rate and points specified in such new Agreement may be higher than either the interest rate and points specified above or the Lender's then-current market rate and points.

Any questions concerning the terms and conditions of this Agreement may be directed to
SUSAN LEMAN          (720) 524-5160

BY SIGNING BELOW, LENDER AND APPLICANT AGREE TO THE TERMS AND CONDITIONS OF THIS CONFIRMATION AGREEMENT.
Countrywide Bank, FSB.

BY _____          TITLE  CLUB3 LOAN PROCESSOR
       LANI PUGA

Please sign and date below; return the original and keep a copy for your records.

I (We) have read this Confirmation Agreement and agree to all the terms and conditions set forth herein.

_____  8/10/07          _____  8/10/07
Signature                    Date          Signature                    Date
ROBERT J. BOWERS                           JUDY BOWERS

_____  _____          _____  _____
Signature                    Date          Signature                    Date

® Home Equity - Confirmation Agreement
2C760-XX (10/05)                          Page 2 of 2

Exhibit B

Recording Requested by &
When Recorded Return To:
US Recordings, Inc.
2925 Country Drive
St. Paul, MN 55117

Prepared By:
LANI M. PUGA

———————— [Space Above This Line For Recording Data] ————————

[Doc ID #]

*MREP* **DEED OF TRUST** *MR*
(Line of Credit)

THIS DEED OF TRUST, dated   AUGUST 10, 2007     , is between
ROBERT J BOWERS, AND JUDY BOWERS, AS JOINT TENANTS

residing at
13427 KUEHSTER RD, LITTLETON, CO 80127
the person or persons signing as "Grantor(s)" below and hereinafter referred to as "we," "our," or "us" and
LARIMER
the Public Trustee of the   LARIMER                      County of Colorado and hereinafter
referred to as the "Trustee," for the benefit of MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.,
("MERS") a Delaware corporation, with an address of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
MERS is the "Beneficiary" under this Deed of Trust and is acting solely as nominee for
Countrywide Bank, FSB.
("Lender" or "you") and its successors and assigns, with an address of
1199 North Fairfax St. Ste.500, Alexandria, VA 22314

PREMISES: In consideration of the loan hereinafter described, we hereby grant, bargain, sell and convey to the
Trustee in trust for the purposes described below the premises located at:
1501 STOVER STREET, FORT COLLINS
                                             Street, Municipality
LARIMER                  Colorado         80524        (the "Premises").
County                                   ZIP
and further described as:
SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF.

● MERS HELOC - CO Deed of Trust
2D989-CO (11/05)(d)                              Page 1 of 5





The Premises includes all buildings and other improvements now or in the future on the Premises and all rights and interests which derive from our ownership, use or possession of the Premises and all appurtenances thereto, including all water, reservoir, ditch and mineral rights.

WE UNDERSTAND and agree that MERS is a separate corporation acting solely as nominee for Lender and Lender's successors and assigns, and holds only legal title to the interests granted by us in this Deed of Trust, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property, and to take any action required of Lender including, but not limited to, releasing or canceling this Deed of Trust.

This Deed of Trust will secure your loan to us in the principal amount of $ 56,000.00         or so much thereof as may be advanced and readvanced from time to time to
ROBERT J. BOWERS
JUDY BOWERS

the Borrower(s) under the Home Equity Credit Line Agreement And Disclosure Statement (the "Note") dated AUGUST 10, 2007        , plus interest and costs, late charges and all other charges related to the loan, all of which sums are repayable according to the Note. This Deed of Trust will also secure the  performance of all of the promises and agreements made by us and each Borrower and Co-Signer in the Note, all of our promises and agreements in this Deed of Trust, any extensions, renewals, amendments, supplements and other modifications of the Note, and any amounts advanced by you under the terms of the section of this Deed of Trust entitled "Our Authority To You." Loans under the Note may be made, repaid and remade from time to time in accordance with the terms of the Note and subject to the Credit Limit set forth in the Note.

OWNERSHIP: We are the sole owner(s) of the Premises. We have the legal right to mortgage, grant and convey the Premises to the Trustee.

OUR IMPORTANT OBLIGATIONS:

(a) TAXES: We will pay all real estate taxes, assessments, water charges and sewer rents relating to the Premises when they become due. We will not claim any credit on, or make deduction from, the loan under the Note because we pay these taxes and  charges. We will provide you with proof of payment upon request.

(b) MAINTENANCE: We will maintain the building(s) on the Premises in good condition. We will not make major changes in the building(s) except for normal repairs. We will not tear down any of the building(s) on the Premises without first getting your consent. We will not use the Premises illegally. If this Deed of Trust is on a unit in a condominium or a planned unit development, we shall perform all of our obligations under the declaration or covenants creating or governing the condominium or planned unit development, the by-laws and regulations of the condominium or planned unit development and constituent documents.

(c) INSURANCE: We will keep the building(s) on the Premises insured at all times against loss by fire, flood and any other hazards you may specify. We may choose the insurance company, but our choice is subject to your reasonable approval. The policies must be for at least the amounts and the time periods that you specify. We will deliver to you upon your request the policies or other proof of the insurance. The policies must name you as "mortgagee" and "loss-payee" so that you will receive payment on all insurance claims, to the extent of your interest under this Deed of Trust, before we do. The insurance policies must also provide that you be given not less than 10 days prior written notice of any cancellation or reduction in coverage, for any reason. Upon request, we shall deliver the policies, certificates or other evidence of insurance to you. In the event of loss or damage to the Premises, we will immediately notify you in writing and file a proof of loss with the insurer. You may file a Deed of loss on our behalf if we fail or refuse to do so. You may also sign our name to any check, draft or other order for the payment of insurance proceeds in the event of loss or damage to the Premises. If you receive payment of a claim, you will have the right to choose to use the money either to repair the Premises or to reduce the amount owing on the Note.

(d) CONDEMNATION: We assign to you the proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of the Premises, or part thereof, or for conveyance in lieu of condemnation, all of which shall be paid to you, subject to the terms of any Prior Deed of Trust.

(e) SECURITY INTEREST: We will join with you in signing and filing documents and, at our expense, in doing whatever you believe is necessary to perfect and continue the perfection of your lien and security interest in the Premises. It is agreed that the Lender shall be subrogated to the claims and liens of all parties whose claims or liens are discharged or paid with the proceeds of the Agreement secured hereby.



(f) OUR AUTHORITY TO YOU: If we fail to perform our obligations under this Deed of Trust, you may, if you choose, perform our obligations and pay such costs and expenses. You will add the amounts you advance to the sums owing on the Note, on which you will charge interest at the interest rate set forth in the Note. If, for example, we fail to honor our promises to maintain insurance in effect, or to pay filing fees, taxes or the costs necessary to keep the Premises in good condition and repair or to perform any of our other agreements with you, you may, if you choose, advance any sums to satisfy any of our agreements with you and charge us interest on such advances at the interest rate set forth in the Note. This Deed of Trust secures all such advances. Your payments on our behalf will not cure our failure to perform our promises in this Deed of Trust. Any replacement insurance that you obtain to cover loss or damages to the Premises may be limited to the amount owing on the Note plus the amount of any Prior Deeds of Trust.

(g) PRIOR DEED OF TRUST: If the provisions of this paragraph are completed, this Deed of Trust is subject and subordinate to a prior Deed of Trust dated SEPTEMBER 11, 2003 and given by us for the benefit of COUNTRYWIDE HOME LOANS, INC.
as beneficiary, in the original amount of $ 126,895.00      (the "Prior Deed of Trust"). We shall not increase, amend or modify the Prior Deed of Trust without your prior written consent and shall upon receipt of any written notice from the holder of the Prior Deed of Trust promptly deliver a copy of such notice to you. We shall pay and perform all of our obligations under the Prior Deed of Trust as and when required under the Prior Deed of Trust.

(h) HAZARDOUS SUBSTANCES: We shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances on or in the Premises. We shall not do, nor allow anyone else to do, anything affecting the Premises that is in violation of any Environmental Law. The preceding two sentences shall not apply to the presence, use, or storage on the Premises of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Premises. As used in this paragraph, "Hazardous Substances" are those substances defined as toxic or hazardous substances by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. As used in this paragraph, "Environmental Law" means federal laws and laws of the jurisdiction where the Premises are located that relate to health, safety or environmental protection.

(i) SALE OF PREMISES: We will not sell, transfer ownership of, lease for a period in excess of one year (inclusive of tenant's extension options), a mortgage or otherwise dispose of our interest in the Premises, in whole or in part, or permit any other lien or claim against the Premises without your prior written consent.

(j) INSPECTION: We will permit you to inspect the Premises at any reasonable time.

NO LOSS OF RIGHTS: The Note and this Deed of Trust may be negotiated or assigned by you without releasing us or the Premises. You may add or release any person or property obligated under the Note and this Deed of Trust without losing your rights in the Premises.

DEFAULT: Except as may be prohibited by applicable law, and subject to any advance notice and cure period if required by applicable law, if any event or condition of default as described in the Note occurs (such event or condition call a "Default"), you or the Trustee may foreclose upon this Deed of Trust or sell the Premises at a public sale as provided by law. This means that you or the Trustee may arrange for the Premises to be sold, as provided by law, in order to pay off what we owe on the Note and under this Deed of Trust. If the money you receive from the sale is not enough to pay off what we owe you, we will still owe you the difference which you may seek to collect from us in accordance with applicable law. In addition, you or the Trustee may, in accordance with applicable law, (i) enter on and take possession of the Premises; (ii) collect the rental payments, including over-due payments, directly from tentants; (iii) manage the Premises; and (iv) sign, cancel and change leases. We agree that the interest rate set for in the Note will continue before and after a default, entry of a judgment and foreclosure or public sale. In addition, you shall be entitled to collect all reasonable fees and costs actually incurred by you in proceeding to foreclosure or to public sale, including, but not limited to, Trustee's fees, reasonable attorneys' fees and costs of documentary evidence, abstracts and title reports.

ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER: As additional security, we assign to you the rents of the Premises. If a Default occurs, you shall be entitled to the appointment of a receiver by the courts without any notice to us. You or a receiver appointed by the courts shall be entitled to enter upon, take possession of and manage the Premises and collect the rents of the Premises including those past due.

WAIVERS: To the extent permitted by applicable law, we waive and release any error or defects in proceedings to enforce this Deed of Trust and hereby waive the benefit of any present or future laws providing for stay of execution, extension of time, exemption from attachment, levy and sale and homestead exemption.

● MERS HELOC - CO Deed of Trust
2D960-CO (11/05)                    Page 3 of 5



RECEPTION#: 20070065588, 08/27/2007 at 10.30.23 AM, 4 OF 21, $66.00 Doyle,
Larimer County, CO

**BINDING EFFECT:** Each of us shall be fully responsible for all of the promises and agreements in this Deed of Trust. Until the Note has been paid in full and your obligation to make further advances under the Note has been terminated, the provisions of this Deed of Trust will be binding on us, our legal representatives, our heirs and all future owners of the Premises. This Deed of Trust is for your benefit and for the benefit of anyone to whom you may assign it. Upon payment in full of all amounts owing to you under the Note and this Deed of Trust, and provided any obligation to make further advances under the Note has terminated, this Deed of Trust and your rights in the Premises shall end.

**NOTICE:** Except for any notice required under applicable law to be given in another manner, (a) any notice to us provided for in this Deed of Trust shall be given by delivering it or by mailing such notice by regular first class mail addressed to us at the last address appearing in your records or at such other address as we may designate by notice to you as provided herein, and (b) any notice to you shall be given by certified mail, return receipt requested, to your address at
For MERS:
P.O. Box 2026, Flint, MI 48501-2026
For Lender:
1199 North Fairfax St. Ste.500, Alexandria, VA 22314
or to such other address as you may designate by notice to us. Any notice provided for in this Mortgage shall be deemed to have been given to us or you when given in the manner designated herein.

**RELEASE:** Upon payment of all sums secured by this Deed of Trust and provided your obligation to make further advances under the Note has terminated, the Trustee shall discharge this Deed of Trust without charge to us, except that we shall pay any fees for recording of a satisfaction of this Deed of Trust.

* MERS HELOC - CO Deed of Trust
2D989-CO (11/03)                    Page 4 of 5

GENERAL: You or the Trustee can waive or delay enforcing any of your rights under this Deed of Trust without losing them. Any waiver by you of any provisions of this Deed of Trust will not be a waiver of that or any other provision on any other occasion.

THIS DEED OF TRUST has been signed by each of us under seal on the date first above written.

Grantor ROBERT J. BOWERS

Grantor JUDY BOWERS

Grantor

Grantor

STATE OF COLORADO,                        County ss: *Jefferson*

The foregoing instrument was acknowledged before me this *10th* day of *August* 2007, by *Robert J. Bowers + Judith E. Bowers*

Witness my hand and official seal.
My Commission Expires: *March 08, 2010*

Notary Public
*Sandra L. Lopez*

Sandra L Lopez
Notary Public
State of Colorado
My Commission Expires Mar 8, 2010

® MERS HELOC - CO Deed of Trust
20968-CO (11/05)                        Page 5 of 6



**1-4 FAMILY RIDER**
Assignment of Rents

THIS 1-4 FAMILY RIDER is made this 10th day of AUGUST, 2007 , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Note to:
Countrywide Bank, FSB.

1199 North Fairfax St. Ste.500
Alexandria, VA 22314
("Lender") of the same date and covering the Property described in the Security Instrument and located at:
1501 STOVER STREET
FORT COLLINS, CO 80524
1-4 FAMILY COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

A.   **ADDITIONAL PROPERTY SUBJECT TO THE SECURITY INSTRUMENT.** In addition to the Property described in the Security Instrument, the following items are added to the Property description, and shall also constitute the Property covered by the Security Instrument: building materials, appliances, and goods of every nature whatsoever now or hereafter located in, on, or used, or intended to be used in connection with the Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling and attached

● HELOC - 1-4 Family Rider
1U443-XX (12/05)(d)                         Page 1 of 5



floor coverings now or hereafter attached to the Property, all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the Property covered by the Security Instrument. All of the foregoing together with the Property described in the Security Instrument (or the leasehold estate if the Security Instrument is on a leasehold) are referred to in this 1-4 Family Rider and the Security Instrument as the "Property."

B.  **USE OF PROPERTY; COMPLIANCE WITH LAW.** Borrower shall not seek, agree to or make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change. Borrower shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property.

C.  **SUBORDINATE LIENS.** Except as permitted by federal law, Borrower shall not allow any lien inferior to the Security Instrument to be perfected against the Property without Lender's prior written permission.

D.  **RENT LOSS INSURANCE.** If Borrower at any time does not occupy the Property, and rents the Property, Borrower shall maintain insurance against rent loss in addition to the other hazards for which insurance is required by the Security Instrument.

E.  **ASSIGNMENT OF LEASES.** Upon Lender's request, Borrower shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph E, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

F.  **ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION.** Borrower absolutely and unconditionally assigns and transfers to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrower authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender and Lender's agents. However, Borrower shall receive the Rents until (i) Lender has given Borrower notice of default pursuant to paragraph 21 of the Security Instrument and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agents. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notice of breach to Borrower; (i) all Rents received by Borrower shall be held by the Borrower as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) Borrower agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting Rents, including, but not limited to, attorneys' fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

Except in connection with a senior loan secured by the property as disclosed to Lender in writing prior to the date hereof, Borrower represents and warrants that Borrower has not executed any prior assignment of Rents and has not and will not perform any act that would prevent Lender from exercising its rights under this paragraph. Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all of the sums secured by the Security Instrument are paid in full.

**G.   PROTECTION OF LENDER'S RIGHTS IN THE PROPERTY.** If Borrower fails to perform the covenants and agreements contained in this Security Agreement, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture or to enforce laws or regulations), then Lender may do and pay for whatever is necessary to protect the value of the Property and Lender's rights in the Property. Lender's actions may include paying any sums secured by a lien which has priority over this Security Instrument, appearing in court, paying reasonable attorneys' fee and entering on the Property to make repairs. Although Lender may take action under this paragraph, Lender does not have to do so. Any amounts disbursed by Lender under this paragraph shall become additional debts of Borrower secured by the Security Instrument.

• HELOC - 1-4 Family Rider
1U443-XX (12/05)                           Page 3 of 5

RECEPTION#: 20070068586, 09/27/2007 at 10:30:23 AM, 5 OF 12, Scott Doyle
Larimer County, CO

H.  **CROSS-DEFAULT PROVISION.** Borrower's default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.



BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this 1-4 Family Rider.

ROBERT J. BOWERS _____ Borrower

JUDY BOWERS _____ Borrower

_____ Borrower

_____ Borrower

• HELOC - 1-4 Family Rider
1U443-XX (12/05)          Page 5 of 5

RECEPTION#: 20070065580, 08/27/2007 at 10:30:25 AM, 1 of 1, Larimer County, CO

EXHIBIT A

ALL THE REAL PROPERTY, TOGETHER WITH IMPROVEMENTS, IF ANY,
SITUATE, LYING AND BEING IN THE COUNTY OF LARIMER AND STATE
OF COLORADO, DESCRIBED AS FOLLOWS:

LOT 4 UNIVERSITY ACRES FIRST SUBDIVISION, ACCORDING TO THE
RECORDED PLAT PLAT THEREOF CITY OF FORT COLLINS, COUTNY OF
LARIMER, STATE OF COLORADO.

ALSO KNOWN AS STREET NUMBER: 1501 STOVER STREET, FORT
COLLINS, CO 80524.

ADDRESS: 1501 STOVER STREET;   FORT COLLINS, CO 80524    TAX



RECEPTION#:20170047089, 6/20/2017 9:20:05 PM, 1 of 2, $13.00 Electronically Recorded
Angela Myers, Clerk & Recorder, Larimer County, CO

Exhibit C

This Document Prepared By:
**LISA CAMPBELL MOORE**
**BANK OF AMERICA**
**MC: FL1-908-01-05**
**4909 SAVARESE CIR.**
**TAMPA, FL 33634**
**(800) 444-4302**

When Recorded Mail To:
**FIRST AMERICAN TITLE**
**COMPANY**
**240 TECHNOLOGY DR.**
**IDAHO FALLS, ID  83401**

_____ [Space Above This Line for Recording Data] _____

## ASSIGNMENT OF DEED OF TRUST

For Value Received, **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. ("MERS") AS NOMINEE FOR COUNTRYWIDE BANK, FSB., ITS SUCCESSORS AND ASSIGNS** (herein "Assignor"), whose address is P.O. Box 2026, Flint, MI 48501-2026, does hereby grant, assign, transfer and convey unto **BANK OF AMERICA, N.A.** (herein "Assignee"), whose address is **1800 TAPO CANYON RD., SIMI VALLEY, CA 93063**, and its successors and assigns all its right, title and interest in and to a certain Deed of Trust described below.

Original Beneficiary: **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. ("MERS"), AS NOMINEE FOR COUNTRYWIDE BANK, FSB., ITS SUCCESSORS AND ASSIGNS**
Borrower(s): **ROBERT J BOWERS, AND JUDY BOWERS, AS JOINT TENANTS**
Original Trustee: **THE PUBLIC TRUSTEE OF THE LARIMER COUNTY OF COLORADO**
Date of Deed of Trust: **AUGUST 10, 2007**
Original Loan Amount: **$56,000.00**
Property Address: **1501 STOVER STREET, FORT COLLINS, COLORADO 80524**

Recorded on **AUGUST 27, 2007** in **INSTRUMENT NO. 20070065588** of the official Records of **LARIMER COUNTY**, State of **COLORADO**

Page 1

RECEPTION #20170041982, 6/26/2017 4:20:05 PM, 2 of 2, $18.00  Electronically Recorded
Angela Myers, Clerk & Recorder, Larimer County, CO

IN WITNESS WHEREOF, the undersigned has caused this Assignment of Deed of Trust to be executed on

_____JUN 2 3 2017_____
Date

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. ("MERS") AS NOMINEE FOR
COUNTRYWIDE BANK, FSB, ITS SUCCESSORS AND ASSIGNS

By: _____   MARTHA CORREA
                                 ASSISTANT VICE PRESIDENT

_____ [Space Below This Line for Acknowledgments] _____

STATE OF FLORIDA
COUNTY OF HILLSBOROUGH

The foregoing instrument was acknowledged before me this _____JUN 2 3 2017_____

by MARTHA CORREA, ASSISTANT VICE PRESIDENT, of MORTGAGE ELECTRONIC
REGISTRATION SYSTEMS, INC. ("MERS") AS NOMINEE FOR COUNTRYWIDE BANK, FSB.,
ITS SUCCESSORS AND ASSIGNS, a company, on behalf of the company. He/She is personally known to
me or who has produced _____N/A_____ as identification.

_____
Notary Public

LOURDES RODRIGUEZ
Notary Public, State of Florida
Commission# FF 998453
My comm. expires June 2, 2020

Printed Name: _____Lourdes Rodriguez_____
My commission expires: _____JUN 0 2 2020_____

This Document Prepared By:
LISA CAMPBELL MOORE
BANK OF AMERICA
MC: FL1-908-01-05
4909 SAVARESE CIR.
TAMPA, FL 33634
(800) 444-4302

When Recorded Mail To:
FIRST AMERICAN TITLE
COMPANY
240 TECHNOLOGY DR.
IDAHO FALLS, ID 83401

Tax/Parcel #: N/A

_____ [Space Above This Line for Recording Data] _____

# ASSIGNMENT OF DEED OF TRUST

For Value Received, COUNTRYWIDE HOME LOANS, INC., the undersigned holder of a Deed of Trust (herein "Assignor"), whose address is 4909 SAVARESE CIRCLE, TAMPA, FL 33634, does hereby grant, sell, assign, transfer and convey, unto BANK OF AMERICA, N.A. (herein "Assignee"), whose address is 1800 TAPO CANYON RD., SIMI VALLEY, CA 93063, all beneficial interest under a certain Deed of Trust made and executed by ROBERT J. BOWERS, AND JUDY BOWERS ("Borrower"), to THE PUBLIC TRUSTEE OF LARIMER COUNTY, COLORADO ("Trustee"), upon the following property located at 1501 STOVER STREET, FORT COLLINS, COLORADO 80524 and situated in LARIMER COUNTY, State of COLORADO.

Such Deed of Trust having been given to secure payment of $126,895.00, to and in favor of original lender COUNTRYWIDE HOME LOANS, INC., which Deed of Trust is dated SEPTEMBER 11, 2003 and recorded on SEPTEMBER 18, 2003 in INSTRUMENT NO. 2003-0120339 of the official Records of LARIMER COUNTY , State of COLORADO, together with all rights accrued or to accrue under such Deed of Trust.

TO HAVE AND TO HOLD the same unto Assignee, its successor and assigns, forever, subject only to the terms and conditions of the above-described Deed of Trust.

RECEPTION #20170042483, 6/28/2017 11:58:30 AM, 2 of 2, $18.00 Electronically Recorded
Angela Myers, Clerk & Recorder, Larimer County, CO

IN WITNESS WHEREOF, the undersigned has caused this Assignment of Deed of Trust to be executed on

_____ JUN 2 6 2017 _____
Date

COUNTRYWIDE HOME LOANS, INC.

By: _____
(Signature)
Ariana Garcia
Assistant Vice President

_____ [Space Below This Line for Acknowledgments] _____

STATE OF FLORIDA
COUNTY OF HILLSBOROUGH

The foregoing instrument was acknowledged before me this   JUN 2 6 2017

by _____ Ariana Garcia _____, _____ Assistant Vice President _____, of

COUNTRYWIDE HOME LOANS,  INC., a _____ N/A _____ company, on behalf

of the company. He/She is personally known to me or who has produced

_____ N/A _____ as identification.

_____
Notary Public

Printed Name: _____ Martha Lucia Correa _____
My commission expires: _____ 1/26/2019 _____

MARTHA LUCIA CORREA
Notary Public, State of Florida
Commission# FF 192644
My comm. expires Jan. 26, 2019

## CORPORATE ASSIGNMENT OF DEED OF TRUST

CO/LARIMER

Assignment Prepared on: April 03, 2020

**Assignor: BANK OF AMERICA, N.A. BY SELECT PORTFOLIO SERVICING, INC. ITS ATTORNEY IN FACT,** at C/O SELECT PORTFOLIO SERVICING, INC., 3217 S. DECKER LAKE DRIVE, SALT LAKE CITY, UT, 84119

**Assignee:** FIRSTKEY MORTGAGE, LLC, at 900 THIRD AVENUE, STE. 500, NEW YORK, NY, 10022-3055

For value received, the Assignor does hereby grant, sell, assign, transfer and convey, unto the above-named Assignee all interest under that certain Deed of Trust Dated: 8/10/2007, in the amount of $56,000.00, executed by ROBERT J BOWERS, AND JUDY BOWERS, AS JOINT TENANTS to MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. ("MERS") AS NOMINEE FOR COUNTRYWIDE BANK, FSB., ITS SUCCESSORS AND ASSIGNS and Recorded: 8/27/2007, Reception #: 20070065588 in LARIMER COUNTY, State of Colorado.

Property Address: 1501 STOVER STREET, FORT COLLINS, CO, 80524

TO HAVE AND TO HOLD, the same unto Assignee, its successors and assigns, forever, subject only to the terms and conditions of the above-described Deed of Trust.

BANK OF AMERICA, N.A. BY SELECT PORTFOLIO SERVICING, INC. ITS ATTORNEY IN FACT

On: APR 1 4 2020

By: _Sherry Nielsen_

Name: Sherry Nielsen

Title: Document Control Officer

State of UTAH
County of SALT LAKE

On APR 1 4 2020 , before me, **Shelley Malm** , a Notary Public in and for SALT LAKE in the State of UTAH, personally appeared **Sherry Nielsen** , Doc. Control Officer , BANK OF AMERICA, N.A. BY SELECT PORTFOLIO SERVICING, INC. ITS ATTORNEY IN FACT, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity, and that by his/her/their signature on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal,

_Shelley Malm_
Shelley Malm
Notary Expires: FEB 1 1 2021 / #: 692961

SHELLEY MALM
Notary Public State of Utah
My Commission Expires on:
February 11, 2021
Comm. Number: 692961

**When Recorded Return To:** Jeff Prose, Richmond Monroe Group, 82 Jim Linegar Ln, Branson West, MO, 65737, (417) 447-2931
CO/LARIMER

## CORPORATE ASSIGNMENT OF DEED OF TRUST

CO/LARIMER

Assignment Prepared on: April 03, 2020

**Assignor:** FIRSTKEY MORTGAGE, LLC BY SELECT PORTFOLIO SERVICING, INC., ITS ATTORNEY IN FACT, at C/O SELECT PORTFOLIO SERVICING, INC., 3217 S. DECKER LAKE DRIVE, SALT LAKE CITY, UT, 84119

**Assignee:** TOWD POINT MORTGAGE TRUST 2019-2, U.S. BANK NATIONAL ASSOCIATION, AS INDENTURE TRUSTEE, at C/O SELECT PORTFOLIO SERVICING, INC., 3217 S. DECKER LAKE DRIVE, SALT LAKE CITY, UT, 84119

For value received, the Assignor does hereby grant, sell, assign, transfer and convey, unto the above-named Assignee all interest under that certain Deed of Trust Dated: 8/10/2007, in the amount of $56,000.00, executed by ROBERT J BOWERS, AND JUDY BOWERS, AS JOINT TENANTS to MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. ("MERS") AS NOMINEE FOR COUNTRYWIDE BANK, FSB., ITS SUCCESSORS AND ASSIGNS and Recorded: 8/27/2007, Reception #: 20070065588 in LARIMER County, State of Colorado.

Property Address: 1501 STOVER STREET, FORT COLLINS, CO, 80524

TO HAVE AND TO HOLD, the same unto Assignee, its successors and assigns, forever, subject only to the terms and conditions of the above-described Deed of Trust.

FIRSTKEY MORTGAGE, LLC BY SELECT PORTFOLIO SERVICING, INC., ITS ATTORNEY IN FACT

On: APR 1 4 2020

By: *Sherry Nielsen*

Name: Sherry Nielsen

Title: Document Control Officer

State of UTAH
County of SALT LAKE

On APR 1 4 2020 , before me, Shelley Malm , a Notary Public in and for SALT LAKE in the State of UTAH, personally appeared Sherry Nielsen , Doc. Control Officer , FIRSTKEY MORTGAGE, LLC BY SELECT PORTFOLIO SERVICING, INC., ITS ATTORNEY IN FACT, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity, and that by his/her/their signature on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal,

*Shelley Malm*
Shelley Malm

Notary Expires: FEB 1 1 2021 / #: 692961

SHELLEY MALM
Notary Public State of Utah
My Commission Expires on:
February 11, 2021
Comm. Number: 692961

**When Recorded Return To:** Jeff Prose, Richmond Monroe Group, 82 Jim Linegar Ln, Branson West, MO, 65737, (417) 447-2931
**CO/LARIMER**